**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**SCOTT L. BARNHART**
Keffer Barnhart LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ERIC P. BABBS**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| COREY HAMERSLEY | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 53A05-1309-CR-477 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MONROE CIRCUIT COURT
The Honorable Kenneth Todd, Judge
Cause No. 53C03-1205-FA-458

**September 29, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Following a jury trial, Corey Hamersley was convicted of Attempted Murder,[1] a class A felony; Criminal Recklessness as a class C felony;[2] Criminal Recklessness as a class D felony;[3] and Resisting Law enforcement as a class A misdemeanor.[4] Hamersley was sentenced to an aggregate sentence of thirty-four years with six years suspended and the balance executed. Hamersley presents three issues for our review:

1. Did the trial court abuse its discretion in denying Hamersley's motion to continue the jury trial?

2. Did the trial court abuse its discretion in admitting into evidence Hamersley's statement to police?

3. Is the sentence imposed inappropriate?

---

[1] Ind. Code Ann. § 35-41-5-1 (West, Westlaw 2012) (attempt); Ind. Code Ann. § 35-42-1-1 (West, Westlaw current through 2012 Second Regular Session) (murder). The version of the attempt statute in effect at the time this offense was committed classified attempted murder as a class A felony. This statute has since been revised and in its current form reclassifies the offense as a Level 1 felony. *See* I.C. § 35-41-5-1 (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly). The new classification, however, applies only to offenses committed on or after July 1, 2014. *See id*. Because this offense was committed on May 11, 2012, it retains the former classification.

[2] I.C. § 35-42-2-2(c)(3)(A) (West, Westlaw 2012) (shooting a firearm into an inhabited dwelling). The version of the criminal recklessness statute in effect at the time of this offense was committed classified this offense as a class C felony. This statute has since been revised and in its current form reclassifies the offense as a Level 5 felony. *See* I.C. § 35-42-2-2(a),(b)(2)(A) (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly). The new classification, however, applies only to offenses committed on or after July 1, 2014. *See id*. Because this offense was committed on May 11, 2012, it retains the former classification.

[3] I.C. § 35-42-2-2(b)(1), (c)(2)(A) (firing shots in an occupied neighborhood). The version of the criminal recklessness statute in effect at the time of this offense was committed classified this offense as a class D felony. This statute has since been revised and in its current form reclassifies the offense as a Level 6 felony. *See* I.C. § 35-42-2-2(a),(b)(1)(A) (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly). The new classification, however, applies only to offenses committed on or after July 1, 2014. *See id*. Because this offense was committed on May 11, 2012, it retains the former classification.

[4] Ind. Code Ann. § 35-44.1-3-1 (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly). This statute has been revised, but in its current form, the offense for which Hamersley was convicted remains unchanged. We therefore have cited to the current version of the statute.

We affirm.

In May 2012, Hamersley was a twenty-one-year-old student at Indiana University in Bloomington. Hamersley lived in the Terra Trace apartment complex on the south side of 15th Street near the intersection of 15th and Lincoln. Margaret and David Greischar lived in a one-story, yellow house on the north side of 15th Street, across from Terra Trace.

On the morning of May 11, 2012, at approximately 6:30 a.m., Margaret awoke to the sound of gunfire, which she initially believed to be fireworks. Margaret called the police to report the disturbance. Margaret then stepped out onto her front porch, which faced Terra Trace, and could hear a male yelling in a "very angry" voice. *Transcript* at 344. In the same timeframe, Jason Heap, who lived at Terra Trace, heard a popping noise and looked outside his apartment window. Heap saw Hamersley, who was naked but wearing a hat on his head, crawling up a hill on the other side of the street. Heap did not see any other persons with Hamersley. Heap also observed that Hamersley had a gun in his hand.

Shortly thereafter, Margaret's husband, David, went outside the house and was confronted by a naked Hamersley. Hamersley asked David, "which window would you like?", implying that he was going to shoot out the windows to the house. *Id.* at 355. David rushed back into the house and told Margaret to call 911 because "he's got a gun." *Id*. at 346.

3

While Margaret was on the phone, Hamersley appeared at the back door to the house and tried to push his way in. Margaret and David braced themselves against the door and managed to secure it. Margaret noted that Hamersley had "really wide eyes, he looked very wild, and he was talking crazy," saying things like, "where are my demons?" *Id.* at 347. Margaret also noticed that Hamersley had a silver handgun. Margaret and David sought safety by hunkering down behind a refrigerator on the other side of the kitchen. Hamersley continued pounding on the door and trying to gain entry. The pounding stopped and shortly thereafter, Hamersley began firing shots into the house. One bullet passed within two feet of the Greischars and lodged in a kitchen wall. The Greischars crawled into their living room and sought cover behind a heavy oak desk. Hamersley finally moved away from the Greischars' back door and started walking down the alley.

Another neighbor, Samantha Weigel, witnessed Hamersley firing shots at the Greischars' home. She overheard Hamersley saying, "come on guys we'll fire again on three," after which Hamersley counted to three and fired more shots in rapid succession at the Greischars' door. Weigel did not see any other individuals with Hamersley. Hamersley did not appear to Weigel to be staggering or stumbling around. Rather, she explained that Hamersley took an "affirmative," "purposeful" stance when he fired his gun. *Id.* at 484.

Officer Dana Runnebohm of the Bloomington Police Department responded to the scene. Officer Runnebohm first encountered Hamersley near the Greischars' home and saw Hamersley raise his right arm and fire his gun into the air. Officer Runnebohm

4

described Hamersley as being "deliberate in his actions." *Id*. at 426. Officer Runnebohm positioned herself behind a tree, pointed her service weapon at Hamersley, and yelled at him several times, "police, drop your weapon." *Id*. at 427. Hamersley took a "shooter's stance" with both hands on his gun and fired a shot in Officer Runnebohm's direction. *Id*. at 430. When Hamersley pulled the trigger, Officer Runnebohm heard Hamersley say, "you will."[5] *Id.* at 434. Officer Runnebohm retreated to a garage area for better protection. Hamersley then moved closer to the Greischars' home and fired more shots at the house. Officer Runnebohm then moved back to her position near the tree and again ordered Hamersley to drop his weapon. Hamersley took a few steps in Officer Runnebohm's direction and again, taking a shooter's stance with both hands on his gun, fired his weapon at Officer Runnebohm a second time.

Additional officers arrived at the scene as Hamersley walked down the alley toward Terra Trace. Hamersley did not comply with those officers' commands to drop his weapon, so those officers opened fire on Hamersley, shooting him twice, once in the back of each leg. While on the ground, Hamersley thrashed his legs around and tried to kick the officers who were trying to subdue him. Hamersley also stiffened his arms to keep from being handcuffed. The officers managed to seize Hamersley's weapon, which was identified as a nine-millimeter Ruger P-89 semiautomatic pistol.

A crime-scene investigation recovered seventeen nine-millimeter casings in the area of 15th Street and Terra Trace. Additionally sixteen casings of that type were

---

[5] Officer Runnebohm could not hear what Hamersley ended this statement with or if he even spoke additional words.

recovered from behind the Greischars' home. Seven of Hamersley's bullets left holes in the Greischars' rear door and one bullet went through the doorknob. In total, six bullets entered the Greischars' home. One bullet lodged in a wall near the refrigerator, having narrowly missed Margaret and David. Hamersley also fired shots at two cars parked in the alleyway beside the Greischars' home, both of which sustained bullet damage. All thirty-three casings were analyzed and determined to have been fired from Hamersley's gun. Hamersley's gun had a fifteen-round magazine, which meant that with one bullet in the chamber, the gun could carry a total of sixteen rounds.

Immediately after being taken into custody, Hamersley was transported to Bloomington Hospital, arriving at 7:28 a.m. Hamersley underwent surgery for his gunshot wounds. After a brief time in recovery, Hamersley was taken to a private room on the fourth floor short-stay unit. Nurse Mary Senior attended to him upon his arrival in his room. Nurse Senior noted that Hamersley's vital signs were normal, that he was alert and cooperative and tracked her movements around the room. Hamersley answered questions appropriately and knew his name, his date of birth, and was aware that he had undergone surgery. Hamersley did not appear disoriented, confused, or scared, and in fact, was able to clearly speak, explaining to Nurse Senior that he was a student at Indiana University and that he thought he might be under arrest for murder. Hamersley never complained of dizziness or abnormal sensations and he never referred to objects that were not present.

While being tended to by Nurse Senior, Hamersley initiated a conversation with an officer who was waiting in the alcove of his hospital room. Specifically, Hamersley

6

inquired about the officer's weapon and then asked the officer where his (i.e., Hamersley's) gun was located and indicated that he wanted it back. The officer noted that Hamersley was oriented, that he was tracking the conversation, and that his mood and reactions appeared normal.

At 1:03 p.m., Detective Sarah Carnes of the Bloomington Police Department conducted an audio recorded interview of Hamersley in his hospital room. The interview lasted approximately an hour and twenty-three minutes. Detective Carnes read Hamersley his Miranda rights. Hamersley stated that he did not have any questions about those rights and noted he "can" make the process quicker by "not" talking to Detective Carnes. *State's Exhibit* 185. Hamersley then proceeded to answer questions. Detective Carnes transitioned the interview from general background questions to Hamersley's memory of the events of the previous night and earlier that morning. At all times during the interview, Hamersley was oriented as to time and place, was "very cooperative" and "polite," and was able to track the conversation and respond appropriately to questions. *Transcript* at 1019. Detective Carnes had no concerns that Hamersley was intoxicated at the time she interviewed him.

During his trial testimony, Hamersley admitted that he ingested a liquid form of LSD, consumed alcohol, and smoked marijuana. Hamersley told Detective Carnes that he had been to three bars, the names of which he recalled, between the hours of 7:00 p.m. and 3:00 a.m. After the bars closed, Hamersley walked home. Although Hamersley did not have a dog, he claimed that later that morning, he took his dog for a walk. He further explained to her that while out walking his dog in the nude, he was shot by police once in

7

each calf with their "bean bag guns". *Id*. Hamersley was "pretty sure [he] had a gun in his hand" and that this is why the police shot him. *Id*. Hamersley also talked about the presence of helicopters that morning and a swarm of police officers. Hamersley believed that at some point during the previous night, he had been picked up by undercover detectives conducting a drug-trafficking investigation. He later stated that the individuals he knew as Ron and Sprout had acted as undercover police and had driven him around after the bars closed.

Detective Carnes then revisited the subject of where and how Hamersley had fired his gun that morning. Hamersley first reiterated that he had only fired his gun into the air. He also stated that a police officer had approached him and asked to see his gun and then the officer handed his gun back to him. Hamersley ultimately admitted to Detective Carnes that he may have fired his gun at a police officer, that he shot out car windows because "glass is way more fun to break than anything else," that he shot at the Greischars' back door in an attempt to break in, which gave him an "adrenaline rush." *Exhibit* 185. Hamersley told Detective Carnes that he was fully aware of what was going on and he was in his right mind when he did these things.

Detective Carnes also questioned Hamersley about his intent in shooting at Officer Runnebohm. Hamersley acknowledged that he shot at the officer when she told him to drop his weapon. He first claimed that he intended to strike the officer's "flack jacket" without hurting the officer. Hamersley then admitted that he "aimed center mass" when he shot at Officer Runnebohm. *Id*. Hamersley volunteered, "I was like dude how cool would it be to say I shot a cop – that was like literally the thought that went through my

8

head before I pulled the trigger." *Id*. He concluded by saying, "[n]ot many people can say they shot a cop and got away with it." *Id*.

On May 16, 2012, the State charged Hamersley with attempted murder, a class A felony; criminal recklessness as a class C felony (shooting a firearm into an inhabited dwelling); criminal recklessness as a class D felony (firing shots in an occupied neighborhood); two counts of pointing a firearm, class D felonies; and resisting law enforcement as a class A misdemeanor.[6]

On October 30, 2012, Hamersley filed a motion to suppress challenging the admissibility of his statement to police while he was in the hospital. The basis of Hamersley's argument was that he was interrogated while he "was in a state of psychosis caused by the LSD ingestion that had not resolved." *Appellant's Appendix* at 101. The trial court held a hearing on the motion to suppress on March 12 and April 5, 2013. During the suppression hearing, Hamersley admitted that he had used LSD "upwards of fifty times over . . . the two years" preceding the instant offense. *Transcript* at 226. Hamersley claimed that on May 10, 2012, he voluntarily ingested LSD in liquid form when his friend, Sprout, provided it to him. Hamersley claims that he fell asleep at a friend's house and that he has no memory of the events that followed and that he did not remember making a statement to Detective Carnes. On May 8, 2013, the trial court denied Hamersley's motion to suppress his statement taken on May 11, 2012.

---

[6] The State also charged Hamersley with class D felony possession of a controlled substance and class A misdemeanor possession of marijuana, but the State dismissed these charges prior to trial.

9

On May 15, 2013, Hamersley filed a motion to continue the jury trial scheduled for May 20, 2013, so that he could secure testimony of an expert witness, who Hamersley claimed would testify about the intoxicating effects of LSD. After holding a hearing on the motion, the trial court denied Hamersley's motion for a continuance. Prior to the start of the trial, Hamersley asked the court to reconsider his motion for continuance, and the trial court again denied Hamersley's motion to continue the jury trial.

A jury trial was held from May 20 to May 29, 2013. At the conclusion of the evidence, the jury found Hamersley guilty of all counts, save one count of pointing a firearm. The guilty verdict on the remaining charge of pointing a firearm was merged with the attempted murder conviction.

The trial court held a sentencing hearing on August 30, 2013. The trial court sentenced Hamersley to thirty years for attempted murder, with twenty-four years executed and six years suspended; to four years for class C felony criminal recklessness, to be served consecutively to the attempted murder sentence; to one and one-half years for class D felony criminal recklessness, to be served consecutively to the attempted murder sentence and concurrently to the C felony criminal recklessness sentence; and to one year for resisting law enforcement, to be served concurrently with the attempted murder sentence. Hamersley therefore received an aggregate sentence of thirty-four years, with six years suspended and the balance executed. Hamersley now appeals.

1.

Hamersley argues that the trial court abused its discretion in denying his motion to continue the jury trial so that he could secure the testimony of an expert witness to

provide testimony regarding the effects of LSD. Hamersley acknowledges that his request for a continuance was non-statutory. Where a motion for continuance is filed on non-statutory grounds, we review the trial court's decision to grant or deny the continuance for an abuse of discretion. *Tharpe v. State,* 955 N.E.2d 836 (Ind. Ct. App. 2011), *trans. denied.* An abuse of discretion occurs when a decision is clearly against the logic and effect of the facts and circumstances before the court or where the record demonstrates prejudice to the defendant from a denial of the continuance. *Id.* With this standard of review in mind, we also consider that:

> Every defendant has the fundamental right to present witnesses in his or her own defense. This right is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecutor's to the jury so it may decide where the truth lies. At the same time, while the right to present witnesses is of the utmost importance, it is not absolute. In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.

*Tolliver v. State,* 922 N.E.2d 1272, 1282 (Ind. Ct. App. 2010) (citations and quotations omitted), *trans. denied.*

We initially note that months before trial, Hamersley informed the court of his intentions to call an expert witness who would discuss the effects of LSD on the human mind. The first expert Hamersley sought retired while the case was still pending. Hamersley sought a second expert witnesses, but, despite diligent efforts, was unable to make contact with him. Five days before the jury trial was scheduled to begin, Hamersley filed his motion to continue to allow him to present the testimony of Dr. Jonathan Lipman, Ph.D., a forensic consultant and expert witness in neuropharmacology,

11

neurotoxicology, and idiosyncratic effects of drugs and their interactions on human behavior. Hamersley's motion to continue was based on his desire to secure testimony from Dr. Lipman about "the effects of LSD on the human mind." *Appellant's Appendix* at 234.

In a three-page order denying Hamersley's motion to continue, the court stated, "the question of the materiality and admissibility of the expert testimony sought to be obtained is central to the question of whether the trial should be continued to obtain it." *Id*. at 256. The court continued:

> Despite the passage of more than a year from the filing of the charges and the additional time granted to [Hamersley] to make a demonstration to the contrary, there is nothing before the Court that evades the principle . . .that 'temporary mental incapacity produced by voluntary intoxication is not an excuse for a crime.' . . . Or, to state it differently, there is nothing before the Court that would allow it to conclude that the testimony of a neuropharmacologist describing 'the effects of LSD (voluntarily ingested) on the human mind' . . is, in and of itself, relevant and material to any issue which might conceivably provide a defense in this case."

*Id*. The trial court determined that Hamersley's purported defense was simply an argument about voluntary intoxication, which the court noted is not a defense to a crime under Indiana law. *See Berry v. State*, 969 N.E.2d 35, 42 (Ind. 2012) (holding that "temporary mental incapacity produced by voluntary intoxication is not an excuse for a crime"). The trial court therefore concluded that because the sought-after testimony was not relevant or material to a legal defense, there was no just reason to delay the trial.

We agree with the trial court's assessment. "[V]oluntary intoxication is not a defense in a prosecution for an offense and may not be taken into consideration in determining the existence of a mental state that is an element of the offense. *See Orta v.*

12

*State*, 940 N.E.2d 370, 378 (Ind. Ct. App. 2011), *trans. denied*; *see also* Ind. Code Ann. § 35-41-2-5 (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly). The Indiana Supreme Court has held that I.C. § 35-41-2-5 eliminates the requirement that a voluntarily intoxicated defendant have acted "knowingly" or "intentionally" as to those crimes that include those elements. *Sanchez v. State*, 749 N.E.2d 509, 517 (Ind. 2001). Therefore, voluntary intoxication is sufficient to place the voluntarily intoxicated offender at risk for the consequences of his actions, "even if it is claimed that the capacity has been obliterated to achieve the otherwise requisite mental state for a specific crime." *Id.* In other words, evidence of voluntary intoxication does not negate a defendant's *mens rea*, but rather satisfies it. *Sanchez v. State*, 749 N.E.2d 509.

Hamersley explained to the court during the hearing on his motion to continue that on the morning of the incident, he was "in a psychotic state due to an ingestion of LSD." *Transcript* at 251. In his motion to continue, Hamersley explained the importance of Dr. Lipman's testimony, asserting that the jury would need "an understanding of the effects of LSD as it may preclude any possibility of conviction on the charge of attempted murder based upon an understanding that a person who is laboring under psychosis cannot form the requisite specific intent to commit the crime of attempted murder." *Appellant's Appendix* at 234.

As noted, Hamersley does not deny that he voluntarily[7] ingested LSD. Hamersley's conduct thereafter was a product of his voluntary intoxication. The trial court was correct in concluding that Dr. Lipman's testimony about the effect of LSD on the human mind related to his voluntary intoxication, which, as noted, is not a legal defense in Indiana. Because such evidence was not relevant to a legal defense, it would not have been admissible. Therefore, we conclude that the trial court did not abuse its discretion in denying Hamersley's motion to continue so he could secure such testimony.

To the extent Hamersley frames his argument as a challenge to the effect of the denial of his motion to continue, i.e., to exclude Dr. Lipman as a witness in support of his defense and in support of his argument that his statement to police was involuntary, such argument fails because Hamersley failed to make an offer to prove at trial. *See Harman v. State*, 4 N.E.3d 209 (Ind. Ct. App. 2014), *trans. denied*. To reverse a trial court's decision to exclude evidence, there must have been error by the court that affected the defendant's substantial rights and the defendant must have made an offer of proof or the

---

[7] An involuntary intoxication defense is not supported by the facts. An involuntary intoxication defense disputes the existence of intent. *Ellis v. State*, 736 N.E.2d 731 (Ind. 2000). I.C. § 35-41-3-5 (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly) provides: "It is a defense that the person who engaged in the prohibited conduct did so while he was intoxicated, only if the intoxication resulted from the introduction of a substance into his body: (1) without his consent; or (2) when he did not know that the substance might cause intoxication." As noted above, Hamersley admitted that he voluntarily ingested LSD. In fact, Hamersley admitted that he had used LSD "upwards of fifty times over the [preceding] two years." *Transcript* at 226. Hamersley described his prior experiences with LSD, but claims that he did not know it could cause intoxication. Hamersley's statements are self-serving and do not establish involuntary intoxication.

Further, to the extent that Hamersley argues that his intoxication rose to the level of psychosis, we note that "temporary mental incapacity, when induced by voluntary intoxication, normally furnishes no legal excuse, or defense to, a crime." *Jackson v. State*, 273 Ind. 49, 402 N.E.2d 947, 949 (1980) (*cited in Berry v. State*, 969 N.E.2d at 38). Thus, any evidence that Hamersley's voluntary ingestion of LSD may have resulted in a psychosis would not have supported an involuntary intoxication defense.

14

evidence must have been clear from the context. *Stroud v. State*, 809 N.E.2d 274 (Ind. 2004). An offer to prove consists of three parts: "(1) the substance of the evidence, (2) an explanation of its relevance, and (3) the proposed grounds for its admissibility." *Nelson v. State*, 792 N.E.2d 588, 594 (Ind. Ct. App. 2003) (citing *Roach v. State*, 695 N.E.2d 934, 939 (Ind. 1998), *reh'g granted on other grounds*), *trans. denied*. "[T]he purpose of an offer to prove is 'to preserve for appeal the trial court's allegedly erroneous exclusion of evidence.'" *Arhelger v. State*, 714 N.E.2d 659, 664 (Ind. Ct. App. 1999) (*quoting Bradford v. State*, 675 N.E.2d 296, 302 (Ind. 1996), *reh'g denied*).

Hamersley only generally stated in his motion to continue that Dr. Lipman's testimony would cover "the effects of LSD on a human mind." *Appellant's Appendix* at 234. During the hearing on the motion to continue, Hamersley did not further explain what those effects were or how they were relevant to the present case. Hamersley did not take any steps to make an offer to prove at trial. Hamersley has therefore waived his argument to the extent that he frames it in exclusion-of-evidence terms.

In any event, as we noted above, Dr. Lipman's testimony would not have been relevant to any legal defense. Hamersley admitted that he voluntarily ingested LSD. Furthermore, we note that Hamersley was able to get his defense (valid or not) before the jury when he testified he had no recollection of the events of the morning of May 11. In further support of his defense, Hamersley also presented the testimony of Dr. Chad Schultheis, who had interviewed Hamersley while he was at the hospital and determined that Hamersley's "incident" was "clearly related to substance use." *Transcript* at 911. Dr. Schultheis further explained that Hamersley suffered "an acute confusional state," *id*.

15

at 912, meaning that Hamersley was "incredibly intoxicated" such that the "excessive amount of substances . . . cause[d] him to be not aware of everything going on around him." *Id*. at 916.

Hamersley also asserts that Dr. Lipman's testimony was also needed to address his claim that "his statement to police was involuntary" and that "Hamersley was so intoxicated that he was in a state of mania" when he gave his statement to police. *Appellant's Brief* at 12. Hamersley maintains that Dr. Lipman's testimony would have helped explain to the jury some of the nonsensical statements Hamersley made during his statement to police.[8]

Here, Hamersley's claim that Dr. Lipman's testimony would have undermined his confession to police is pure speculation. Hamerlsey did not make an offer to prove, but simply characterized Dr. Lipman's testimony as being about the effects of LSD on the human mind. Hamersley did not establish a nexus between Dr. Lipman's testimony and the voluntariness of his statement. Further, blood and urine tests taken in the hospital revealed no LSD in Hamersley's system. Several individuals, including a nurse and Detective Carnes, who interacted with Hamersley at the hospital around the time he gave his statement each noted that Hamersley was alert, not confused, oriented as to time and place, cooperative, and polite. It is therefore unclear as to whether Dr. Lipman's opinion about the effects of LSD on the human mind could have been used to undermine Hamersley's statement to police.

---

[8] For example, Hamersley claimed that helicopters were around on the morning of the incident which were in fact not present, that he was out walking a dog that he did not have, and that he had been picked up the night before by two undercover officers investigating drug trafficking.

16

2.

Hamersley argues that the trial court abused its discretion in admitting the audiotape of his statement to police into evidence. Specifically, Hamersley argues that his statement to police was not voluntary because he made the statement while suffering from a psychosis brought about by his ingestion of LSD.

Our standard of review is well settled. The admission of evidence is within the sound discretion of the trial court, whose decision thereon will not be reversed absent a showing of manifest abuse of discretion resulting in the denial of a fair trial. *Johnson v. State,* 831 N.E.2d 163 (Ind. Ct. App. 2005). A decision is an abuse of discretion if it is clearly against the logic and effect of the facts and circumstances before the court. *Id.* We consider the evidence in favor of the trial court's ruling and any unrefuted evidence in the defendant's favor. *Id.* We will take into account the foundational evidence from the trial as well as the evidence from the motion to suppress hearing which is not in direct conflict with the trial testimony. *Kelley v. State,* 825 N.E.2d 420.

The burden is upon the State to prove beyond a reasonable doubt that the defendant voluntarily and intelligently waived his *Miranda* rights and that his statement was voluntarily given. *Ringo v. State,* 736 N.E.2d 1209 (Ind. 2000). "A waiver of one's *Miranda* rights occurs when the defendant, after being advised of those rights and acknowledging that he understands them, proceeds to make a statement without taking advantage of those rights." *Ringo v. State,* 736 N.E.2d at 1211-12. Thus, an express written or oral waiver is not required to establish that a defendant waived his *Miranda* rights. *Horan v. State,* 682 N.E.2d 502 (Ind. 1997); *Cook v. State,* 544

17

N.E.2d 1359 (Ind. 1989). In deciding whether *Miranda* rights were voluntarily waived, we consider the totality of the circumstances to ensure that the waiver was not induced by violence, threats, or other improper influences that overcame the defendant's free will. *Ringo v. State,* 736 N.E.2d 1209.

Here, there is no evidence of police coercion. In fact, Detective Carnes did not use deceptive tactics to induce a confession. The location of the interview is a neutral factor, for although Hamersley was confined to a bed, there was only one police officer present. The interview lasted approximately an hour and a half and at no point did Hamersley ask for a break or seem tired. In fact, Hamersley was very conversational throughout the entire interview.

With regard to his mental state, Hamersley points out his manic state during the incident that had occurred earlier that day. Hamersley's mental state at the time of the incident, however, does not equate to his mental state at the time he gave his statement. The record reveals that Hamersley is an intelligent person with no history of mental health problems. Moreover, his statement was given nearly six hours after the incident occurred.

Hamersley asserts that his level of intoxication rendered his statement involuntary. Our Supreme Court has held that a confession may be given knowingly and voluntarily, notwithstanding voluntary intoxication. *Ellis v. State,* 707 N.E.2d 797 (Ind. 1999). We will deem a defendant's confession incompetent only when he is so intoxicated that it renders him not conscious of what he is doing or produces a state of mania. *Id.*

Intoxication to a lesser degree only goes to the weight to be given to the confession, not its admissibility. *Id.*

As evidence of his intoxication, Hamersley points out that during the interview he made statements that were not true or simply did not make sense. For instance, Hamersley points to the fact that he purportedly saw helicopters that were not there, that he referred to walking a dog that he did not have, and that undercover officers had picked him up and driven him around. Hamersley maintains that such illogical and unfounded statements prove that his statement was not the product of rational intellect.

Confounding Hamersley's claims is evidence from numerous individuals, including Nurse Senior and Detective Carnes, that Hamersley was coherent, alert, oriented as to time and place, and that he was able to answer questions appropriately and track the conversation. Detective Carnes testified that Hamersley could correct her if she misspoke, that he never appeared agitated, but rather was "very cooperative" and "very polite" and even helped her draw a diagram of the crime scene. *Transcript* at 1019. Detective Carnes had no concerns that Hamersley was intoxicated at the time she interviewed him.

Considering the above, we conclude that Hamersley's alleged intoxication did not render his statement to police involuntary. *See Luckhart v. State*, 736 N.E.2d 227 (Ind. 2000). The nonsensical statements that he made during the interview go to the weight to be given to the confession, not to its admissibility. The trial court did not abuse its discretion in admitting into evidence Hamersley's statement to police.

19

3.

Hamersley challenges the sentence imposed. In sentencing the defendant, the trial court was meticulous in addressing each mitigating factor proffered by Hamersley. The court noted that this case was "unique" in that Hamersley, "but for the abuse of alcohol and substances was certainly of good character and law abiding" prior to this incident. *Transcript* at 1485. The trial court rejected Hamersley's proffered mitigating circumstance that the difference in culture between Sheridan, Indiana and Bloomington played a factor in the lifestyle of drugs and thrill-seeking that Hamersley chose to follow when he came to Bloomington. The court noted that Hamersley was "still responsible for the poor judgments that you make that lead you to indulge in such substances and the loss of judgment and the poor conduct and behavior that can result from that." *Id*. at 1487. The court acknowledged that there was apparently no criminal objective to be gained by his conduct and that the offense resulted from his "intoxicated state." *Id*. at 1490.

The court found Hamersley's history of drug abuse to be neither an aggravating nor mitigating factor, but rather an "explanatory factor" as to how Hamersley found himself in the position he is in. *Id*. at 1491. With regard to the impact of the incident on the victims, the court found such to be an aggravating factor. The court did not find Hamersley's age to be a significant factor with regard to its sentencing determination. The court afforded minimal weight to the fact that Hamersley assisted the drug task force with regard to its investigation of drug trafficking. The court gave some mitigating weight to Hamersley's expression of remorse, stating that he believed his remorse was "genuine." *Id*. at 1492. The trial court also considered as a mitigating circumstance that

20

Hamersley voluntarily sought rehabilitation when he was released to home detention. In its balancing of the aggravating and mitigating factors, the court found that the mitigating factors "slightly" outweighed the aggravating factors. *Id*. at 1493.

The court pronounced the sentence as follows: thirty years for attempted murder, with twenty-four years executed and six years suspended; four years for class C felony criminal recklessness, to be served consecutively to the attempted murder sentence; to one and one-half years for class D felony criminal recklessness, to be served consecutively to the attempted murder sentence and concurrently with the C felony criminal recklessness sentence; and to one year for resisting law enforcement, to be served concurrently with the attempted murder sentence. Hamersley therefore received an aggregate sentence of thirty-four years, with six years suspended and the balance executed.

Hamersley argues that the sentence imposed is inappropriate. Article 7, section 4 of the Indiana Constitution grants our Supreme Court the power to review and revise criminal sentences. *See Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014). Pursuant to Ind. Appellate Rule 7, the Supreme Court authorized this court to perform the same task. *Cardwell v. State*, 895 N.E.2d 1219 (Ind. 2008). Per App. R. 7(B), we may revise a sentence "if after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." *Inman v. State*, 4 N.E.3d 190, 203 (Ind. 2014) (quoting App. R. 7). "Sentencing review under Appellate Rule 7(B) is very deferential to the trial court."

21

*Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). Hamersley bears the burden on appeal of persuading us that his sentence is inappropriate. *Conley v. State*, 972 N.E.2d 864.

The determination of whether we regard a sentence as appropriate "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Bethea v. State*, 983 N.E.2d 1134, 1145 (Ind. 2013) (quoting *Cardwell v. State,* 895 N.E.2d at 1224). Moreover, "[t]he principal role of such review is to attempt to leaven the outliers." *Chambers v. State*, 989 N.E.2d 1257, 1259 (Ind. 2013). It is not our goal in this endeavor to achieve the perceived "correct" sentence in each case. *Knapp v. State*, 9 N.E.3d 1274. Accordingly, "the question under Appellate Rule 7(B) is not whether another sentence is *more* appropriate; rather, the question is whether the sentence imposed is inappropriate." *King v. State,* 894 N.E.2d 265, 268 (Ind. Ct. App. 2008) (emphasis in original). Our Supreme Court has indicated that, when analyzing the appropriateness of a criminal sentence, there is "no right answer ... in any given case." *Brown v. State*, 10 N.E.3d 1, 8 (Ind. 2014) (quoting *Cardwell v. State,* 895 N.E.2d at 1224). Rather, appellate review and, where appropriate, revision "ultimately boils down to the appellate court's 'collective sense of what is appropriate, not a product of a deductive reasoning process.'" *Id.* (quoting *Cardwell v. State*, 895 N.E.2d at 1225). Ultimately, we "focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." *Id.*

We first consider the nature of the offense. Hamersley fired at least thirty-three shots from a semi-automatic handgun. He fired some of those shots in the air, some of

the shots at vehicles and buildings in a residential area, and fired six shots into the Greischars' home. Hamersley fired two shots at Officer Runnebohm, both times taking an aggressive stance and aiming at center mass. That Hamersley claims he did not know he could react the way he did following his use of LSD is not a defense to the crimes. Aside from his admitted drug use and his reaction to the ingestion of LSD prior to the incident at hand, Hamersley stated in the PSI interview that he had never experienced any mental health issues that would warrant treatment. An independent psychological evaluation did not find any indications of mental illness.

With regard to the character of the offender, we note that although Hamersley does not have a documented history of criminal behavior, he admitted that he has used LSD upwards of fifty times over a two-year period and that he has used other illegal substances. To be sure, Hamersley has a minor history of delinquent behavior, which included a pretrial diversion for a marijuana possession charge. Despite admitting to his frequent use of illegal drugs, Hamersley denies that he has a substance abuse problem.

Although the record demonstrates that Hamersley was an accomplished student during high school and at Indiana University, those facts do not excuse his choice to abuse marijuana, LSD, and alcohol. We do recognize that Hamersley expressed remorse for his actions and that the trial court found such to be genuine.

Having considered the nature of the offense and the character of the offender, we cannot say that Hamersley's twenty-eight year executed sentence, which is less than the advisory sentence for the most serious offense for which Hamersley was convicted (i.e.,

attempted murder),[9] is inappropriate. With due consideration to the trial court's decision, we affirm the sentence imposed.

Judgment affirmed.

VAIDIK, C.J., and MAY, J., concur.

---

[9] *See* Ind. Code Ann. § 35-50-2-4 (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly) ("A person who commits a Class A felony (for a crime committed before July 1, 2014) shall be imprisoned for a fixed term of between twenty (20) and fifty (50) years, with the advisory sentence being thirty (30) years").